# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ESTATE OF WANDA LORRAINE KELLY
JOHNSON, ARI SIMONE FOSTER, individually,
and as heir and personal representative of the
Estate of Wanda Lorraine Kelly Johnson, ESTATE
OF ETHELEAN KING KELLY, ESTATE OF
CLARENCE KELLY, JR., SARAH DENISE
KELLY, individually, and as heir and personal
representative of the Estate of Ethelean King Kelly
and of the Estate of Clarence Kelly, Jr., ANDRA
LAMAR KELLY, and DEMARCO LASHAWN
KELLY

         Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN,

         Defendant.

_____/

Civil Action No. 23-cv-1689

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT
## AND TO TAKE JUDICIAL NOTICE OF EVIDENCE IN PRIOR RELATED CASES

This case arises out of the July 25, 1996 terrorist bombing attack against the United

States Air Force Base in Dhahran, Saudi Arabia. This was the "Khobar Towers" terrorist

attack, named after the residential complex where service members were housed (the

"Attack"). The Attack was materially supported and planned by Defendant the Islamic

Republic of Iran. Nineteen American service members were killed in the Attack, and many

others were injured.

Wanda Lorraine Kelly Johnson ("Wanda") was among the service members injured in the

Attack. Declaration of Ari Simone Foster ¶ 7[1]. Wanda passed away on November 28, 2021. Ari ¶

---

[1] Declarations of the Plaintiffs have been filed. These include the declarations of Ari Simone Foster, Sarah Kelly,
Andra Kelly, and Demarco Kelly. Plaintiffs' declarations will be cited using the declarant's first name followed by
the relevant paragraphs from the declaration being cited.

4. Plaintiff, Ari Simone Foster ("Ari"), is Wanda's only daughter, and was appointed administrator of Wanda's estate. Ari ¶¶ 4-5 and Exhibit C. Ari sues on her own behalf and on behalf of Plaintiff, Estate of Wanda Lorraine Kelly Johnson. Plaintiffs, Sarah Denise Kelly ("Sarah"), Andra Lamar Kelly ("Andra"), and Demarco Lashawn Kelly ("Demarco") are Wanda's siblings. Wanda's parents were Ethelean Kelly ("Ethelean") and Clarence Kelly, Jr. ("Clarence"), both of whom died after the Attack but before this action was filed. Sarah was appointed administrator of the Estates of Ethelean Kelly and Clarence Kelly, Jr., which are also plaintiffs herein. All of the Plaintiffs seek damages arising out of the Attack, Wanda's injuries, and the pain, suffering, and solatium endured by each of them.

## I.      Plaintiffs Have Properly Served Iran and It Has Failed To Appear and Is in Default.

Plaintiffs have complied with all requirements for service on Defendant the Islamic Republic of Iran under 28 U.S.C. Section 1608(a), which provides for service on a foreign sovereign and its political subdivisions in one of four ways. The first two, by (1) "special arrangement for service between the plaintiff and the foreign state," and (2) "in accordance with an applicable international convention on service of judicial documents," are inapplicable here.[2] Section 1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted here. ECF No. 7 (affidavit requesting foreign service pursuant to 28 U.S.C. § 1608(a)(3)). And on June 20, 2023, the Clerk's office filed its Certificate confirming that it had

---

[2] This Court has repeatedly so held. E.g., *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 78 (D.D.C. 2017) (BAH) ("Defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service….").

dispatched the service documents pursuant to 28 U.S.C. § 1608(a)(3). ECF No. 9 (Certificate of Clerk ). However, service under subsection (a)(3) was not successful.

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes "diplomatic service" by requesting the Clerk of the Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted." After the lapse of more than 30 days, the Clerk transmitted the required papers to the United States State Department. ECF No. 14.

On February 26, 2024, the Clerk of the Court filed a letter from the State Department, which included a Certification of Diplomatic Note attesting to the December 27, 2023 service of the required papers through diplomatic channels pursuant to 28 U.S.C. 1608(a)(4). ECF No. 15. Thus, Iran was properly served in this action.

Pursuant to 28 U.S.C. Section 1608(d), defendants had sixty days after service was effected "to plead or otherwise defend" this action. See Fed. R. Civ. P. 55(a). Iran's time to do so expired on February 26, 2024, and on February 27, 2024, the Plaintiffs filed an Affidavit in Support of a Clerk's entry of default. ECF No. 16. The Clerk of the Court entered default against Iran on February 27, 2024. DE 17. Plaintiffs now seek entry of default final judgment as to both liability and damages.

## II.    The Court May Assert Personal Jurisdiction Over Iran.

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *Estate of Hirshfeld, 330 F. Supp. 3d at 136-137* (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process). "In other words, 'under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction.'" *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012), quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002). Moreover, "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price* 294 F.3d at 87 (foreign states are not "persons" entitled to due process).

Because Defendant, Iran, was properly served with this action, and as discussed below, this Court has subject matter jurisdiction, the Court may assert personal jurisdiction over Iran.

## III.    The Court May Take Judicial Notice of Evidence Establishing the Same Defendant's Liability for the June 25, 1996 Terrorist Attack on the Khobar Towers.

This action arises out of the terrorist attack on June 25, 1996, on the Khobar Towers apartment complex in Dhahran, Saudi Arabia.  All Plaintiffs' claims arise from that same single terrorist bombing attack.

This Court has already found defendant liable for the same terrorist attack in several prior decisions: *See e.g.*, *Blais et al. v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser et al. v. Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS

108011, 2019 WL 2717888 (D.D.C. 2019); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020); *Mustard v. Islamic Republic of Iran*, No. 21-CV-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) *Gration v. Islamic Republic of Iran*, No. 21-CV-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023).

In *Blais* and *Estate of Heiser*, the Court heard extensive evidence, including expert testimony, and held that Iran was liable for the same June 25, 1996, terrorist attack on the Khobar Towers at issue in this case. "In *Heiser I* alone, the evidentiary hearing took seventeen days and included examination of witnesses, including seven expert witnesses." *Blank v. Islamic Republic of Iran*, No. CV 19-3645 (BAH), 2021 WL 3021450, at *1 (D.D.C. July 17, 2021). In *Blank* (*id.* at n. 2), this Court recounted the extensive scope of the expert testimony presented in *Heiser*:

> The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"), *Heiser I*, 466 F. Supp. 2d at 252–53, 260–62; (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism, *id.* at 253–54, 262; (3) Dr. Bruce Tefft, a founding member of the Central Intelligence Agency ("CIA") Counterterrorism Bureau and regular consultant on issues of terrorism, *id.* at 253–54, 263–64; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *id.* at 253, 262; (5) Dr. Thomas Parsons, a medical examiner, *See id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *See id.* at 269–70, 275, 280, 283, 285–86, 288–91, 293, 295, 297–303, 308, 310–12, 314, 316–18, 322–27, 330, 332, 335–36, 339–45, 347–51, 353–55; and (7) Dr. Herman Miller, an economic consultant, *id.* at 273–74, 282, 288, 290, 292, 300, 307, 313–14, 320–21, 330, 334, 338.

In the *Rimkus* case, the court took judicial notice of the evidence presented in *Blais* and *Heiser* to impose liability on Iran for the Attack. Iran defaulted and did not appear in the *Blais, Heiser, Rimkus, Akins, Aceto, Schooley, Christie,* or *Blank* cases, just as it has defaulted and refused to appear in this case. Plaintiffs here are similarly situated in all respects to the plaintiffs in those cases.

Fed. R. Evid. 201 authorizes the Court to take judicial notice of facts previously determined by the court in circumstances such as those presented here. "It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." *Veg-Mix Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) (citations omitted). The Court held in *Heiser* that "a court may take judicial notice of related proceedings and records in cases before the same court." *Heiser*, supra, 466 F. Supp. 2d at 262-63, quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005).

In *Blank*, this Court explained the applicability of judicial notice in FSIA terrorism cases. *Blank*, 2021 WL 3021450, at *2. It held that while judicial notice "does not conclusively establish the facts found in those cases," it permits courts in subsequent related cases to "reach their own independent findings of fact." *Id*. (citations omitted). The court also recognized that the D.C. Circuit has endorsed this procedure in FSIA terrorism cases. *Id*, citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014).

The Court has recognized the appropriateness of taking such judicial notice and entering default judgments as to liability in subsequent cases involving the same terrorist incidents previously adjudicated against the same defendants in default. *E.g.*, *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 103 (D.D.C. 2007); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009) ("this Court may take judicial notice of related proceedings and records in cases before the same court.") *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010) ("the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence"); see also *Murphy v. Islamic Republic of Iran,* No. 06-cv-596 (D.D.C. Oct. 2, 2007); *Estate of Anthony K. Brown v. Islamic Republic of Iran*, No. 08-cv-531 (D.D.C. Feb. 1, 2010).

In *Rimkus,* the Court concluded that judicial notice of findings in the *Heiser* and *Blais* cases would be appropriate because "the history of litigation stemming from the bombing of Khobar Towers … is extensive." 750 F. Supp.2d at 167. The Rimkus court continued:

> Over years of litigation, the plaintiffs in both *Blais* and *Heiser* presented substantial evidence to the Court concerning the Khobar Towers bombing. In *Blais,* the plaintiffs submitted evidence concerning the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time of the bombing, and under his direction the FBI "conducted a massive and thorough investigation of the attack, using over 250 agents." *Blais,* 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI in 1996, and subsequent to the attack he became the Section Chief for all international terrorism at the Bureau. He was responsible "for day to day oversight of the FBI investigation" and has given sworn testimony concerning the results of the investigation. *Id.*750 F. Supp.2d at 168.

The *Rimkus* opinion further detailed the evidence it judicially noticed from *Blais* and *Heiser* for holding defendants liable for the Khobar Towers terrorist attack:

> In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id.* at 48-49. In *Heiser,* the evidence was even more extensive than in *Blais,* and was presented to a magistrate judge over the course of more than two weeks. *Heiser I,* 466 F. Supp. 2d at 250….
>
> Based on all of the above evidence, as well as additional documentary and testimonial submissions, the Court in both *Blais* and *Heiser* concluded that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah to execute the plan… *Id.* at 265; *Blais,* 459 F. Supp. 2d at 48 (quoting with approval Dr. Tefft's conclusion that defendants "were responsible for planning and supporting the attack on the Khobar Towers").

750 F. Supp.2d at 168 (footnote omitted).

Accordingly, Plaintiffs' motion asking the Court to take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996, is well-supported.

The evidence submitted to, and relied upon by, the courts in the prior cases involving the Khobar Towers attack supports a finding that Iran is subject to the Court's subject matter jurisdiction and that it is liable for the Plaintiffs' claims herein. *See e.g.*, *Aceto v. Islamic Republic of Iran*, No. CV 19-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020).

IV.    **The Plaintiffs' Declarations Support their Right to Entry of Judgment**.

Plaintiffs submit herewith sworn declarations supporting their right to entry of judgment. This Court has held that sworn declarations, such as those submitted by plaintiffs herewith, are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. Section 1608(e), that a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." S e e  e .g., *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), citing, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) and *Weinstein v. Islamic Republic of Iran* 184 F. Supp. 2d 13 at 19 (D.D.C. 2002). This Court has endorsed that view as well. *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 74-75 (D.D.C. 2017).See also, *Akins*, 332 F. Supp. 3d 1; *Schooley*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888; *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020); *Christie*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273. The United States Court of Appeals for the D.C. Circuit has held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." O w e n s  v .  *Republic of Sudan,* 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Plaintiffs note that in *Maalouf v. Islamic Republic of Iran*, 923 F. 3d 1095, 1113 (D.C. Cir. 2019), the D.C. Circuit squarely held that a defendant that does not appear (as here) cannot benefit

from a statute-of-limitations defense: A district court may not "act *sua sponte* to raise affirmative

defenses on behalf of defendants who do not appear to defend actions against them."

> **V.      All Plaintiffs Have Suffered Injuries and May Bring their Claims under Section 1605A and Common Law**.

The state-sponsored terrorism exception provides a private right of action. The action is

available to, among others, nationals of the United States and the legal representatives of such

persons. 28 U.S.C. § 1605A(c). Foreign states that meet subsection (a)(2)(A)(i)'s requirements as

"state sponsors of terrorism" may be held liable under subsection (c) "for personal injury or death"

caused by the foreign state or its agents. *Id*. "In any such action damages may include economic

damages, solatium, pain and suffering, and punitive damages." *Id*.

It is well established that Iran is now, and has continuously been since 1984, a state sponsor

of terrorism. Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in

accordance with the Export Administration Act of 1979, as a "country which has repeatedly

provided support for acts of international terrorism." 49 Fed. Reg. 2836–02 (Jan. 23, 1984)

(statement of Secretary of State George P. Shultz). This designation meets section 1605A's

definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated

as a state sponsor of terrorism to this day. *State Sponsors of Terrorism,* U.S. Dep't of State,

http://www.state.gov/j/ct/list/c14151.htm  (last visited March 30, 2022).

Although Section 1605A(c) provides a private right of action, it does not itself specify the

substantive law to be applied. This Court has therefore applied "general principles of tort law,"

looking to authoritative sources such as the Restatement (Second) of Torts. See, e.g., *Estate of*

*Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *Roth v. Islamic Republic*

*of Iran*, 78 F. Supp. 3d 379 at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44,

54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).

These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is responsible for intentional infliction of emotional distress and the pain and suffering of the immediate family of the deceased as well as loss of consortium and solatium[3].

Thus, courts have found that 1605A(c) allows claims for a wide range of causes of action including wrongful death, battery, assault, solatium. solatium/intentional infliction of emotional distress (IIED), and civil conspiracy, among others. See e.g., *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *30 (battery and IIED), *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017) (civil conspiracy, assault, battery). *Selig v. Islamic Republic of Iran*, 573 F.Supp.3d 40, 63 (D.D.C. Nov. 22, 2021) (wrongful death, solatium and IIED); *Borochov v. Islamic Republic of Iran*, 589 F.Supp.3d 15, 35 (D.D.C. Mar. 4, 2022) (battery, assault, IIED/solatium).

In *Gration*, this Court held that Iran was liable to the service members who were present at the Khobar Towers attack for the torts of battery, and intentional infliction of distress. 2023 WL 5221955 at *30. The Court also held Iran liable to the close family members of those present for intentional infliction of emotional distress, with rights to solatium damages expressly mentioned in Section 1605A(c). *Id*. at 32-33.

All of the Plaintiffs herein are U.S. nationals and may therefore maintain their claims under 28 U.S.C. § 1605A(c), the FSIA's statutory cause of action for terrorism claims against designated state sponsors of terrorism, such as Iran. See Plaintiffs' Declarations in Support of Default

---

[3] "Under the FSIA, a solatium claim is indistinguishable from" a claim for intentional infliction of emotional distress. *Valore v. Islamic Republic of Iran*, 700 F. Supp 2d at 85.

Judgment and exhibits thereto, all of which are filed herewith. Iran's conduct renders it liable for damages to the Plaintiffs under § 1605A(c) based upon several theories, including the following:

### 1. **Battery (for the Estate of Wanda Lorraine Kelly Johnson)**.

Wanda was physically injured during the Attack. Sarah ¶¶ 15, 16. She was inside the residential quarters when the bomb exploded. Sarah ¶ 15. She was rocked by the blast. Sarah ¶ 15. Fearing for her life, Wanda jumped shoeless out of a window, injuring her feet upon landing. Sarah ¶ 15. She also suffered injuries to her shoulders and back and lacerations from broken glass. Sarah ¶ 15. To maintain a § 1605A(c) claim under a theory of battery, Plaintiff must show that (1) Defendants acted intending to cause a harmful or offensive contact with ... or an imminent apprehension of such a contact and (2) a harmful contact directly or indirectly resulted. *Roth v. Islamic Repub. of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015); *Borochov*, 589 F.Supp.3d at 35. Iran supported Hezbollah with the intent to cause harmful contact. "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015).

Wanda was injured in the attack. Wanda's Estate has established Iran's liability under a theory of battery.

### 2. **Assault  (for the Estate of Wanda Lorraine Kelly Johnson)**.

Wanda's Estate also establishes Iran's liability under a theory of assault. Iran acted intending to cause a harmful or offensive contact with or an imminent apprehension of such a contact by Wanda, and Wanda was, in fact, put in such imminent apprehension. *Borochov* 589 F.Supp.3d at 36; see also *Akins v. Islamic Repub. of Iran*, 332 F. Supp. 3d 1, 35–36 (D.D.C. 2018). Wanda was in the Khobar Towers when the bomb was detonated, and she was placed in imminent fear of death. Sarah ¶ 15. "[A]cts of terrorism are, by their very nature, intended to harm and to

terrify by instilling fear of further harm." *Roth*, 78 F. Supp. 3d at 400. Wanda's estate has established its claim for assault.

### 3. **Intentional Infliction of Emotional Distress/Solatium (for all plaintiffs)**.

This Court applies the Restatement (Second) of Torts § 46 definition to determine whether plaintiff establish claims for IIED. *Gration*, 2023 WL 5221955 at *26. "One who by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to the plaintiffs is liable for intentional infliction of emotional distress." *Id*. The Court added: "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Id*. citing, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). As in *Gration*, the declarations of the Plaintiffs here demonstrate that Wanda was physically injured and suffered severe emotional and psychological distress as a result of the Attack.

Claims for intentional infliction of emotional distress ("IIED"), also referred to as solatium, can be brought by victims of an attack and by close relatives of victims. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356-357 (D.C. Cir. 2018); *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018); *Gration*, 2023 WL 5221955, at *28. Solatium damages are intended to compensate the immediate relatives of an injured party for their mental anguish and the loss of the "comfort and society" previously provided by a decedent or injured victim. *Fraenkel v. Islamic Rep. of Iran*, 892 F. Supp. 3d 348, 356-57 (D.C. Cir. 2018). Relatives of a terrorism victim may recover damages for IIED/solatium even where the victim survives the attack. *See e.g.*, *Aceto v. Islamic Republic of Iran*, 2020 WL 619925 (D.D.C. 2020 (parents, siblings, spouses, and children of surviving victims awarded damages for IIED). Claims for this type of emotional injury may be referred to as claims for solatium or IIED; under the FSIA, the two are indistinguishable from one another. *Hirshfeld*, 330 F. Supp. 3d at 140. "Plaintiffs must

show that Defendants by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress." *Id*. at 140-141 (Family members of terrorism victims need only demonstrate that "they suffered mental anguish and trauma as a result of the attack.").

Iran has been found liable to victims and their family members for IIED in other cases involving the Khobar Towers attack. In *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009), the court found that Iran's conduct in materially supporting Saudi Hezbollah was sufficiently outrageous and intended to inflict severe emotional harm upon family members who were not present at the bombing that it allowed the family members to recover for their emotional distress. See also, *Gration*, 2023 WL 5221955, at *28 (same); *Akins*, 332 F. Supp. 3d at 38 (same) *Rimkus*, 750 F. Supp. 2d at 184 (same).

Each of the Plaintiffs establishes Iran's liability under theories of IIED/solatium based upon the severe emotional distress they suffered as a result of the Wanda's injuries.

**VI.      Plaintiffs are Entitled to Compensatory Damages**.

The Plaintiffs' declarations establish the damages suffered by each of them. While Iran is liable to Wanda's estate for battery, assault, and IIED, the bar on multiple recoveries allows her to recover only under one theory for the single underlying harm. *Gration*, 2023 WL 5221955, at *30. Under the single-recovery framework, courts have awarded damages based upon the baseline presumptions of damages amounts established in previous FSIA terrorism cases. *Id*.; *Selig*, 573 F.Supp.3d at 64. "Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016). This baseline amount may be enhanced "in the presence of severe instances of physical and psychological pain" or it may be reduced were the victim suffers only minor injuries. *Id*.; *Gration*, 2023 WL 5221955, at *30. In assessing damages in cases arising out

of the Khobar Towers bombing attack, this Court has relied heavily upon the victims' VA disability ratings to ensure that victims with injuries of comparable severity are similarly compensated. See e.g., *Gration*, 2023 WL 5221955, at *30, citing *Schooley*, 2019 WL 2717888, at *74. "The VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides an effective way of comparing injuries to ensure that similar injuries yield similar awards." *Id*. In *Gration*, this Court applied the "basic rubric" of *Schooley*, 2019 WL 2717888 at *74, and held that servicemembers having VA ratings of up to 30% disabled would receive a baseline award of $5,000,000; those having VA ratings in the range of 40–60% disabled would receive enhanced awards of $6,000,000; and those rated in the range of 70–100% disabled would receive enhanced awards of $7,000,000. *Gration*, 2023 WL 5221955, at *30-31, citing *Ackley*, 2022 WL 3354720, at *51 (using this approach); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same) [4].

Courts have also established precedents for solatium awards for close relatives of victims. See e.g., *Gration*, 2023 WL 5221955, at *34-35. In general, awards for relatives of injured victims are valued at half of the awards to family members of deceased victims. *Id*. at *32. Thus, parents of injured victims generally start with a baseline award $2,500,000 (half of the $5 million baseline for parents of deceased victims). *Id*. For siblings of injured victims, the baseline award is $1,250,000 (half of the $2.5 million baseline for siblings of deceased victims). *Id*. For children, some courts in this district (including this Court) have applied a baseline award of $1,500,000, even though children of deceased victims usually receive $5 million baseline awards. *Id*. at *34-35. Other courts have awarded children of injured victims baseline awards of $2.5 million (half

---

[4] The Court also held that servicemember plaintiffs who did not have VA ratings had adequately demonstrated that they had suffered physical and psychological injuries that warranted baseline awards of $5,000,000.

of the baseline award for children of deceased victims). See e.g., *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020) (citing cases).

### A.  The Estate of Wanda Lorraine Kelly Johnson.

Wanda was inside the residential quarters when the bomb exploded. Sarah ¶ 15. She was rocked by the blast. Sarah ¶ 15; Ari ¶ 24. Fearing for her life, Wanda jumped shoeless out of a window, injuring her feet upon landing. Sarah ¶ 15.  She also suffered injuries to her shoulders and back, and lacerations from broken glass. Sarah ¶ 15.

Wanda was traumatized by the blast and its aftermath. Among other things, in the days following the Attack, Wanda was tasked with restoring the fitness center and setting it up as an evacuation and assembly area. Ari Exhibit D. Wanda was awarded the Airforce Achievement Medal for her work during the day following the bombing. Ari Exhibit D[5]. Wanda was also assigned to Mortuary Affairs, where she was required to process the bodies of the deceased victims and to contact the family members of deceased and severely injured victims. Sarah ¶ 17; Ari ¶ 25. This was particularly difficult for Wanda. Sarah  17.

Wanda's severe emotional injuries were life-altering for her and her entire family. After her return to the United States, Wanda was diagnosed with post-traumatic stress disorder, bipolar disorder, depression, and anxiety. Sarah ¶ 19; Ari ¶ 14. Wanda suffered from nightmares and flashbacks through which she relived the gruesome horrors she experienced during and immediately after the Attack. Ari ¶ 15. She became sensitive to loud noises and crowds. And she became very anxious in other situations, such as when confined to small or dark rooms. Ari ¶ 16.

Wanda became paranoid. Ari ¶ 17. She often threatened to commit suicide. Ari ¶¶ 18, 35. She was prescribed different medications to help with her depression and anxiety. Ari ¶ 27; Sarah

---

[5] The Award identifies Wanda with the last name, Williams, which was her name at the time. Ari, para. 6.

¶21; Andra ¶ 22. She took prescription medications and drank excessively. Ari ¶ 21, 23, 29-37; Sarah ¶ 25; Andra ¶¶ 16, 22, 30-34; Demarco ¶ 23. Wanda simply could not cope with the trauma and fell apart. Demarco ¶ 17. Eventually, due to her extreme self-destructive behavior, Ari was left with no choice but to have Wanda involuntarily committed to the VA Hospital. Ari ¶ 36. Wanda was then sent to a behavioral health facility for detox and other treatment. Ari ¶ 36. Wanda died in November 2021 at age 59 as a result of her chronic alcohol abuse. Ari ¶ 37 and Exhibit B.

The Department of Veterans Affairs (the "VA") gave Wanda a combined disability rating of 100%. Ari, Exhibit F.

Ari Foster brings Wanda's claims in her capacity as personal representative of Wanda's estate. Ari ¶ 5, Exhibit C. Under South Carolina law, "any cause of action which could have been brought by the deceased in his lifetime survives to his representative under the Survival Act." *Gregory v. R.J. Reynolds Tobacco Co., Inc*., No. 720CV04257TLWJDA, 2021 WL 5827290, at *3 (D.S.C. Mar. 26, 2021), *report and recommendation adopted*, No. 720CV04257TLWJDA, 2021 WL 5480905 (D.S.C. Nov. 23, 2021). Therefore, Wanda's claims survived her death and may be brought by Ari as personal representative of Wanda's estate. S.C. Code Ann. § 15-5-90 (causes of action survive death of a deceased person); *Holliday as Tr. of Patricia Anne Holliday Revocable Tr. Dated Dec. 29, 2008 v. Womble Bond Dickinson (US) LLP*, No. CV 2:22-442-RMG, 2022 WL 3020934 at *2 (D.S.C. July 28, 2022), citing, *Fisher on behalf of estate of Shaw-Baker v. Huckabee*, 422 S.C. 234, 811 S.E.2d 739 (2018) (personal representative may prosecute claims on behalf of the estate).

In its recent *Gration* decision, this Court granted enhanced $7 million damages awards to servicemembers who suffered from similar injuries and who had received VA disability ratings in the 70% to 100% disability range. *Gration*, 2023 WL 5221955, at 30.  Applying the objective

metric of the VA disability rating, Wanda's estate should be awarded damages for pain and suffering in the amount of $7 million. See *id.*, citing *Schooley*, 2019 WL 2717888, at *74; see also, *Christie*, 2020 WL 3606273 at *24.

### B.  Ari Simone Foster.

Ari Simone Foster is Wanda's only child. Ari ¶ 5. Ari was only seven years old at the time of the Attack. Ari ¶ 8. Ari's father was also serving in the Airforce at the time Wanda was deployed to Saudi Arabia. Therefore, Ari was sent to live with family friends in Alabama. Ari ¶9. While in the care of these friends, Ari was sexually abused. Ari ¶ 10.

After the bombing of the Khobar Towers, Ari's grandfather picked her up and brought her home to Florida. Ari ¶ 11. When her mother returned, from Saudi Arabia, her behavior changed dramatically. She had become emotionally detached and cold towards Ari. Wanda was unable to empathize or provide Ari with emotional support. Ari ¶ 13. While Ari did not understand at the time, her mother suffered terribly from PTSD, bi-polar disorder, depression, and anxiety. Ari ¶¶ 14, 18-19.

As a survivor of childhood sexual molestation, Ari needed more than the ordinary motherly affection and support. Ari ¶ 20. But instead of offering support, Wanda was emotionally abusive. Ari ¶ 17, 18, 21, 22. On one occasion, Ari saw that her mother was upset. She asked what was wrong. Wanda responded, "You were born." Ari ¶ 20.

Ari worried about her mother and, in particular, about Wanda's alcohol abuse. Ari ¶ 21. When Ari grew up and married, she continued to care for and worry about her mother; she also worried about exposing her children to her mother. Ari ¶ 29-32. Wanda's severe mental health issues and her alcoholism created huge challenges for Ari. Ari ¶¶ 29-32, 35. Eventually, Ari was

left with no choice other than to have Wanda involuntarily committed to the VA Hospital, after which Wanda was sent to another behavioral health facility. Ari ¶ 36.

Under the *Heiser* framework, some courts, including this one, award children of surviving victims a baseline award of $1.5 million. See, e.g., *Gration*, 2023 WL 5221955, at *35. Other courts have awarded children of injured victims baseline awards of $2.5 million (half of the baseline award for children of deceased victims). See e.g., *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020) (citing cases). These courts reason that children (and especially minor children) whose parents are killed or injured are likely to suffer as much as parents of victims and should receive comparable damages awards. *Id*., citing *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 44-45 (D.D.C. 2014), *aff'd in part, question certified sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).

Regardless of whether the Court applies the $1.5 million baseline award it has granted in other Khobar Towers cases or the $2.5 million baseline of some other courts in this district, Ari Foster should be awarded $2.5 million. Ari presents factors supporting an enhanced award. **First**, courts in this district have enhanced awards of children of severely injured parents to compensate for the severe emotional difficulties resulting from the parents' injuries and the impact on the family dynamic. See e.g., *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 39 (D.D.C. 2022); *Sheikh*, 485 F. Supp. 3d at 271. **Second**, "the law permits recovery for aggravation of preexisting conditions." *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 159 (D.D.C. 2009); *see also*, *Braun*, 228 F. Supp. 3d at 86. Thus, a plaintiff is entitled to full compensation where a terrorist attack exacerbates the plaintiff's preexisting physical or emotional injuries or conditions. *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57 (D.D.C. 2008). At the time of the Attack, Ari was dealing with the trauma of having been sexually abused. She needed additional emotional

support. But instead of reuniting with a loving and supportive mother, Ari was forced to cope with a mother who had become emotionally abusive as a direct result of the Attack.

Ari Foster respectfully requests that the Court award her compensatory damages in the amount of $2.5 million.

### C.  The Estates of Ethelean King Kelly and Clarence Kelly, Jr.

Wanda's parents, Ethelean and Clarence Kelly, Jr. both suffered terribly as a result of the Khobar Towers Attack and Wanda's injuries. Demarco ¶ 22. They had both been extremely close with Wanda. Sarah ¶ 22. Wanda would open up to her father more than to anyone else. Sarah ¶ 14. In the immediate aftermath of the Attack, the family had no information about Wanda. They could not even find out whether she had been injured or killed in the bombing. Sarah ¶ 13. The entire family was anxious and distressed. Sarah ¶ 13.

Wanda's psychological injuries caused her parents severe distress and suffering. Sarah ¶ 23. They suffered terribly from Wanda's trauma, lack of communication, bursts of anger, despair, and self-destructive behavior, including alcoholism. Demarco ¶ 23. They felt helpless as Wanda engaged in self-destructive behavior. Sarah ¶¶ 25, 26. It also pained them to see Wanda neglecting her young daughter, Ari. Sarah ¶ 25.

Clarence was particularly close with Wanda. Demarco says, she was their father's "love child." Demarco ¶ 8. After she returned from Saudi Arabia, Wanda would call her father at all hours of the night crying uncontrollably. Sarah ¶ 23. Clarence was devastated because he felt that he could not help his daughter. Sarah ¶ 23. Seeing Wanda in such a state left her father "heartbroken." Demarco ¶ 24, Sarah ¶ 23.

Ethelean was also very close with Wanda. Sarah ¶ 24. Ethelean knew about Wanda's late-night calls to Clarence, and Wanda's condition caused her terrible distress. Sarah ¶ 24. Over time,

Ethelean saw her relationship with Wanda suffer due to a breakdown in communication. Demarco ¶ 25. Ethelean loved Wanda dearly. Andra ¶ 32. But she had a particularly hard time coping with Wanda's alcoholism, which, towards the end of both of their lives, caused serious tension between them. Andra ¶ 30-31.

Several courts have awarded damages for solatium/IIED to estates of deceased relatives of victims of terrorist attacks. In *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020), the court allowed the estates of the parents of a terrorism victim to pursue their claims for IIED. Applying Florida law (which applies here too), the court held that the claims survived the plaintiffs' deaths and could be pursued by their estates. See also, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261 (D.D.C. 2005) (same).

The estates of Wanda's parents Ethelean and Clarence Kelly Jr. should both be awarded baseline awards of $2.5 million in compensatory damages. See e.g., *Gration*, 2023 WL 5221955, at *34.

### D. **Wanda's siblings, Andra, Sarah, and Demarco Kelly, should be awarded baseline awards of $1.25 million each**.

The Kelly family had always been very close-knit. Andra ¶¶ 4, 9, 10; Sarah ¶¶ 9-10; Demarco ¶¶ 5, 15. And Wanda was the one who pulled the family together. Demarco ¶6. Therefore, when Wanda's siblings heard about the bombing of the Khobar Towers, they were distraught. Andra ¶ 12, Sarah ¶ 13; Demarco ¶ 12. Each of Wanda's siblings suffered severe emotional harm as a result of the Attack.

1.      **Andra Kelly**. Andra is the oldest of the Kelly siblings. He was one year older than Wanda, and describes Wanda as "very smart, strong, and easy to get along with." Anda ¶¶ 5-6. In school, Andra and Wanda shared a friendly competition. Andra ¶ 7. When they were in high school, Andra and Wanda were so close that they would often dress alike and go out socially

together. Andra ¶¶ 8-9. Andra says, "I never had any difficulty getting along with Wanda." Andra ¶ 11.

After the Attack, Andra was caught off-guard by the dramatic changes in Wanda's behavior and personality, and by her heavy drinking. Andra ¶¶ 15-17, 22. Wanda would call Andra late at night and if he would not answer, she would leave "long, angry, and hurtful voice messages." Andra ¶ 18. Andra was hurt by Wanda's verbal abuse, and at times, he would block her calls on his phone. Andra ¶ 20.

As the severity of Wanda's psychological injuries sank in, Andra tried to deal with her abuse, and to help her manage. Andra ¶ 23-24. Andra felt helpless in the face of Wanda's suffering from PTSD. Andra ¶ 25. Maintaining their relationship became a struggle for Andra, and remained a struggle until Wanda died. Andra ¶¶ 26-36.

2.   **Sarah Kelly**. Sarah Kelly is Wanda's younger sister. They were two years apart. Sarah ¶ 9. In addition to being sisters, they were best friends. Sarah ¶ 9-10. The Khobar Towers Attack caused dramatic changes to their relationship. Sarah ¶ 9. Sarah says that it was clear to her that Wanda had been severely traumatized by the Attack. Sarah ¶ 18. Wanda's life spiraled out of control as a result of her PTSD, bi-polar disorder, depression, and anxiety. Sarah ¶ 19.

Sarah says Wanda resisted her efforts to help. Sarah ¶ 20. Wanda had a hard time talking about her experience in the bombing. Sarah ¶ 26. Wanda became short-tempered and angry with Sarah and the rest of the family. Sarah ¶ 27. Sarah tried to maintain the peace, but Wanda's extreme outbursts of anger and erratic behavior made Sarah's job extremely difficult. Sarah ¶ 27, Andra ¶ 24. Sarah says that due to the extreme changes in Wanda's behavior after the Attack, Sarah felt like she lost her sister and best friend. Sarah ¶ 28. Sarah stood by Wanda's side throughout. But she could not alleviate Wanda's suffering. Sarah ¶ 29. Sarah suffered with her sister. Sarah ¶ 29.

3. **Demarco Kelly**. Demarco Kelly is the youngest of the Kelly siblings. He was twelve years younger than Wanda. Demarco ¶ 4. Growing up, when Demarco had troubles, he would turn to Wanda for support. Demarco ¶ 4. "She advised me and consoled me when I needed it." Demarco ¶ 4. Demarco describes Wanda as "the Go-To sister. She made sure everyone was okay." Demarco ¶ 7.

After the Attack, Demarco was disappointed and hurt when Wanda did not call him personally to let him know that she was alive. He did not realize how severely traumatized she was by the Attack or how much it would change her. Demarco ¶ 14. But Demarco soon noticed significant changes.

Before the Attack Wanda would always organize something special for the family during the holidays. After the Attack, in some years the family would not even hear from her during the holidays. Demarco ¶ 15. Sometimes, Wanda would disappear for months. This was very concerning for Demarco because he knew Wanda had been in multiple accidents. Demarco ¶ 16. Demarco would worry that something terrible had happened to Wanda. Demarco ¶ 16.

Like the rest of the family, Demarco also was on the receiving end of Wanda's short temper and anger. Demarco ¶ 17. Wanda would sometimes call Demarco in the middle of the night, and she would become angry with him if he was not available to speak. Demarco ¶ 19. On more than one occasion, Wanda became so angry with Demarco she threatened to kill him. Demarco ¶ 18. After a few days, Demarco would try to discuss these incidents with Wanda. But she would act as if nothing had happened and as if she had never threatened him. Demarco ¶ 18.

Demarco says he always loved his sister. Before the Attack, when they had a disagreement, they were always able to patch things up. But after the Attack, it became very difficult to talk with

her or to connect with her. Demarco ¶ 20. Demarco feels that he lost the sister he had before the Attack. "[It] was like having a wound that just does not heal." Demarco ¶ 21.

Each of Wanda's siblings suffered severe mental anguish and extreme emotional pain and suffering as a result of the Attack. They should each be awarded *Heiser* baseline compensatory damages in the amount of $1.25 million. See e.g., *Gration*, 2023 WL 5221955, at *35.

**VII.    Plaintiffs are Entitled to Awards of Punitive Damages.**

In *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020), the Supreme Court decided that punitive damages may be awarded "retroactively" in circumstances such as those present here. Following *Opati*, this Court has awarded such punitive damages. *E.g. Christie v. Islamic Republic of Iran, supra*, 2020 U.S. Dist. LEXIS 116378 at *93. There, the Court awarded punitive damages equal to compensatory damages apportioned among the plaintiffs in amounts proportional to their compensatory damages. *See also*, *Blank*, 2021 WL 3021450 at * 10. Plaintiffs here should be awarded the same measure of punitive damages. Accordingly, the Plaintiffs respectfully request that the Court award punitive damages in the amount of $18.25 million, to be apportioned among the plaintiffs according to their respective compensatory awards.

**CONCLUSION**

For all the reasons stated, the Court should take judicial notice of the evidence submitted in the related and/or similar cases cited herein, and should enter a final judgment against Defendant Iran and in favor of each plaintiff in the amounts set out above, awarding compensatory and punitive damages.

Dated: March 4, 2024                     Respectfully submitted,

                                          /s/ Asher Perlin
                                         Asher Perlin
                                         LAW OFFICE OF ASHER PERLIN
                                         Bar I.D. FL0006
                                         4600 Sheridan Street, Suite 303
                                         Hollywood, Florida 33021
                                         786-233-7164
                                         asher@asherpelin.com
                                         *Attorney for Plaintiffs*